NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

PRESTON CRUMP, III,        :
        :

     Plaintiff,        :            Hon. Dennis M. Cavanaugh
        :

     v.        :               **OPINION**
        :

JO ANNE B. BARNHART,      :     Civil Action No.: 05-CV-2865 (DMC)
Commissioner of Social Security,   :
        :

     Defendant.        :
_____:

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>

This matter comes before the Court upon Preston Crump's ("Plaintiff") appeal from the Commissioner of Social Security's ("Commissioner") final decision denying Plaintiff's request for Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act").   No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure.  For the reasons set forth below, the final decision of the Commissioner is **remanded** for further proceedings consistent with this Opinion.

## I. <u>BACKGROUND</u>

### A. Procedural History

Plaintiff, alleging disability from severe mental health problems, filed an application for disability on March 19, 2003.  (R. at 67).  Plaintiff's claim was denied initially and on reconsideration. (R. at 50, 54-55).  On November 12, 2003, Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ").  (R. at 58).  On August 13, 2004, the ALJ

issued an unfavorable decision and Plaintiff requested the Appeals Council to review the ALJ's

decision.  (R. at 3-5).  On April 1, 2005, the Appeals Council denied Plaintiff's request, thereby

making the ALJ's August 13, 2004 decision, the final determination of the Commissioner.  (Id.)

Plaintiff filed this appeal of that decision in this Court on June 3, 2005.

### B. Factual Background

### 1. Work/Vocational History

Plaintiff was born November 16, 1959, in Newark, New Jersey.  He stopped attending

school after the eleventh grade.  (R. at 14).  Plaintiff's Work History Report states Plaintiff was

employed as a legal secretary from 1979 to 1985, and as a clerk at a brokerage firm from 1985 to

2002.  (R. at 90, 142).  Plaintiff's tasks at his former jobs included typing, answering phones,

word processing, and making arrangements.  (R. at 90).  Plaintiff stopped working in August

2002, and has been on welfare since that date.  (R. at 22, 147-48).  In July 2003, Plaintiff began

attending a computer class for which he expressed optimism.  (R. at 187).  Plaintiff believed this

computer training could lead to a full time job.  (Id.)  He even received a computer from the

training school.  (R. at 183).  Plaintiff actively sought employment by visiting and calling

companies to see if there were available positions. (R. at 183).

The Work History Report also indicates that Plaintiff tries to exercise when he is not

feeling depressed, and goes grocery shopping when he has the money.  (R. at 99).  Plaintiff

currently resides at the Y.M.C.A.  (R. at 101).  His daily chores include cleaning, laundry, and

ironing.  (R. at 101).  Plaintiff prepares meals in the microwave.  (R. at 100).  Plaintiff does not

have a savings account, but spends money when feeling depressed.  (R. at 102).  Plaintiff claims

to have one close friend in Virginia and his daily activities and interests include watching

television and listening to music.  (R. at 140).

## 2. Medical History

Plaintiff initially sought treatment for mental health problems on October 24, 2002. (R. at 138).   Rocco Briscese, M.A., C.P.C. ("Mr. Briscese"), conducted Plaintiff's intake assessment. (Id.)  Mr. Briscese, Plaintiff's therapist, documented that Plaintiff experienced childhood verbal abuse, difficulty sleeping, appetite loss, isolation, and feelings of fear and anxiety. (R. at 138, 183).  Plaintiff's precipitants and recent stressors were documented as concerns of "keeping a roof over his head" and "getting a job."  (Id.)  Plaintiff reported daily anxiety attacks consisting of crying, shaking, and feelings of fear.  (R. at 98).

Mr. Bricese conducted a mental status evaluation of Plaintiff and found Plaintiff did not have a self-perception impairment and that Plaintiff had an appropriate affect and a neutral mood. (R. at 145).  Mr. Briscese also stated in his evaluation that Plaintiff was cooperative and fully oriented.  (Id.)  Mr. Briscese determined Plaintiff's general knowledge to be intact, his memory impaired, his judgment limited, his intelligence average, and his insight and impulse control to be fair.  (R. at 146).  Plaintiff reported that he "feels that everyone is talking about him," he "has thoughts of taking pills sometimes" and "that once in a while he sees a[n] object going by."  (R. at 145).  Mr. Briscese noted the presence of suicidal ideation in Plaintiff.  (Id.)  Plaintiff's goals for treatment included "website design," "working on computers," "writ[ing] music," and achieving financial stability.  (R. at 147).  Mr. Briscese found Plaintiff's motivation for treatment was good.  (Id.)  Plaintiff's coping, social, community living, and vocational skills were noted to be moderately impaired.  (Id.)   Plaintiff's discharge plan included "stability of moods" as well as "getting [and] holding a job."  (R. at 148).  Mr. Briscese's Diagnostic and Statistical Manual of

3

Mental Disorders, Fourth Edition ("DSM-IV") multi axial assessment rendered the following

results: Axis I [clinical syndromes] - Depressive Disorder, NOS 311:00; Axis II [developmental

disorders and personality disorders] - Paranoid Personality Disorder; Axis III [physical

conditions which play a role in the development, continuance, or exacerbation of Axis I and II

Disorders] - none; Axis IV [severity of psychosocial Stressors] - unemployed, Welfare

dependent; Axis V [current global assessment of functioning ("GAF")] - 45  [and highest GAF] -

65."  (R. at 148).

      Beginning on October 31, 2002, Mr. Briscese held weekly therapy sessions with Plaintiff.

(R. at 134).  Mr. Briscese stated in his progress notes that Plaintiff had recurring feelings of

depression, anxiousness, isolation and avoidant behavior.  (R. at 125, 130, 131).  Throughout

subsequent therapy sessions, Mr. Briscese documented Plaintiff's desire for social interaction, his

positive attitude towards getting a job, and listed employment as one of Plaintiff's dreams.  (R. at

130, 135).  Mr. Briscese noted that Plaintiff even requested to "join one of our groups for social

interaction."  (Id.)  Notably, the March 13, 2003 progress notes documented Plaintiff as

obsessing over not being able to find work.  (R. at 129).   Plaintiff was persistent in his efforts to

obtain employment, which included making a trip to the New Jersey Garden and conducting

telephone inquiries.  (R. at 183).

      On November 19, 2002, Plaintiff began seeing a psychiatrist, Marina Galea, M.D., whom

he continued to see on a monthly basis.  (R. at 136).  Dr. Galea's initial psychiatric evaluation

identified Plaintiff as appropriately dressed and cooperative.  (R. at 137).   Dr. Galea determined

Plaintiff was of average intelligence, alert, and had a logical thought process.  (Id.)  Dr. Galea

characterized Plaintiff as having good judgment, impulse control, and frustration tolerance.  (Id.)

Plaintiff denied both suicidal ideations and having audio/visual hallucinations.  (Id.)  However, Plaintiff's attention span and concentration were mildly impaired.  (Id.)  Furthermore, Dr. Galea determined Plaintiff had a constricted affect and depressed mood.  (Id.)  On the DSM-IV multi-axial assessment it showed Plaintiff had a Depressive Disorder on Axis I, "deferred" on Axis II, no problems on Axis III, and Axis IV was marked "unspecified."  (Id.)  Under Axis V, Dr. Galea rated 50 as the current GAF and 70 as the highest GAF in the past year.  (Id.)

In later visits, Dr. Galea stated Plaintiff's mood was anxious, depressed, and his cognitive functioning was impaired.  (R. at 186-87, 195, 200-01).  Overall, Plaintiff's sleep and appetite remained intact.  (Id.)  Additionally, Dr. Galea did not document any experiences of audio/visual hallucinations.  (Id.)  Dr. Galea sometimes reported Plaintiff had passive suicidal ideations and other times noted their absence.  (R. at 186-87).  Throughout the course of treatment, Dr. Galea medicated Plaintiff with Zoloft, Paxil and Prozac.  (R. at 149).

On June 4, 2003, Aryeh Klahr, M.D., completed a consultative psychiatric examination of Plaintiff.  (R. at 150).  Dr. Klahr described Plaintiff as alert, oriented, pleasant, and cooperative. (Id.)  He noted that Plaintiff appeared mildly depressed and anxious.  (Id.)  Noting Plaintiff's ability to "recall three out of three objects immediately and in five minutes," Dr. Klahr observed that the Plaintiff's attention, concentration, immediate and attenuated memory were intact.  (R. at 151).  Dr. Klahr found Plaintiff able to "follow and understand both simple and more complex instructions and [that he] should be able to perform both simple tasks and more complex tasks in a work environment."  (R. at 152).  Dr. Klahr noted that Plaintiff "report[ed] that the anxiety was problematic, but he believes he could work with it."  (R. at 151).  Dr. Klahr's DSM-IV multi axial assessment indicated Depressive Disorder, NOS, and Anxiety Disorder.  (R. at 153).  He

reported NOS on Axis I, Axis II was undetermined, and Axis III was hypercholesterolemia.  (Id.)

Dr. Klahr recommended that Plaintiff continue psychiatric treatment, receive more aggressive

pharmacological treatment, and perhaps switch to a different antidepressant.  (Id.)  Overall, Dr.

Klahr characterized Plaintiff's prognosis as "good."  (R. at 153).

On June 30, 2003, M. Sadiquir Rahman, M.D. conducted a Psychiatric Review Technique

of Plaintiff.  (R. at 154).  Dr. Rahman found the presence of several medically determinable

impairment(s), including Depressive Disorder and Anxiety Disorder, NOS.  Dr. Rahman noted

that these impairments "[did] not precisely satisfy the diagnostic criteria" of Affective Disorders,

12.04 or Anxiety Related Disorders.  (R. at 154-61).  Furthermore, Dr. Rahman identified

Plaintiff as having a mild restriction on daily activities as well as moderate difficulties in

maintaining social functions, concentration, persistence, and pace.  (R. at 164).  Dr. Rahman

found no episodes of decompensation and a Residual Functional Capacity Assessment ("RFC")

identified Plaintiff as being moderately limited in respect to his ability to understand and

remember detailed instructions, maintain a schedule, complete a normal work week without

interruption, and get along with coworkers.  (R. at 172).

### 3. The Hearing

At the hearing, the ALJ questioned Plaintiff regarding his impairments.  Plaintiff testified

he went to therapy once a week and visited a psychiatrist once a month.  (R. at 30).  He said he

was registered with a temporary employment agency, but that he had not been contacted for work

in two years.  (R. at 25).  Plaintiff was laid off from his previous job and stated that firms

complained about his slow typing.  (R. at 36, 41).  Plaintiff explained that he would inform

potential employers about his necessary and expected repeated absences on Mondays for therapy

sessions due to his depression.  (R. at 27-28).  Plaintiff acknowledged having suicidal thoughts, but admitted that he had never made an active attempt to commit suicide.  (R. at 30-31).  Plaintiff explained that during episodes he referred to as panic attacks, he would retreat to the restroom where he would hold himself until he stopped shaking and his fear subsided.  (R. at 43).  These episodes occurred approximately four times a day and lasted about ten to fifteen minutes each.  (R. at 34).

Plaintiff also testified that his symptoms have intensified over time.  (R. at 36).  Initially, Plaintiff said he could hold a job if his employer could handle his panic attacks, but later made a conflicting statement claiming he could not work because of his panic attacks.  (R. at 35, 42).  In response to a question about finding work, Plaintiff said that he was "trying to find part time [work]."  (R. at 27).  On a daily basis, Plaintiff watches television, listens to the radio, and prepares meals.  (R. at 38, 40).  Plaintiff claimed that he did not like being around people because they "start[ed] smelling to [him]."  (R. at 43).  In order to remember something, Plaintiff said he had to "repeat it to [himself] three times."  (R. at 44).  Plaintiff said that he did not trust people due to his feelings that they "are going to act against him."  (R. at 45).

In reaction to certain answers, the ALJ stated Plaintiff was not honest and that he did not really want a job.  (R. at 27).  The ALJ asked Plaintiff, "you are not that dumb, are you?"  (R. at 28).  The ALJ informed Plaintiff that he should know better than to tell potential employers about his necessary and expected repeated absences on Mondays for therapy sessions.  (R. at 26).  After Plaintiff tried to explain his reasoning for revealing his condition to potential employers, the ALJ said to Plaintiff, "I'm sure that makes a hit."  (Id.)

### 4. ALJ Muehlig's Decision

The ALJ found that Plaintiff had "not engaged in substantial gainful activity since the alleged onset of disability" and that his impairment(s) were severe based upon the requirements of the Regulations. (R. at 17). The ALJ found that sufficient medical evidence supported the claim that Plaintiff suffered from depression with anxiety. (R. at 15). However, the ALJ concluded that the evidence did not establish that Plaintiff's depression reached a level of severity with anxiety so as to be compatible with sections 12.04 or 12.06 and therefore, did not satisfy the criteria of Appendix 1, Subpart P. Id. See also, 20 C.F.R. §§ 404.1520(d), 416.920(d). The ALJ further found that the "[m]ental evaluation with Trinitas as well as a psychiatric evaluation with Dr. Khlar, in June 2003, reveal[ed] that despite feelings of depression, anxiousness and a sleep disturbance, there was no evidence of psychosis." (R. at 15). The ALJ noted that Plaintiff complained of panic attacks, but that his treating physician had not diagnosed him with such. (R. at 16).

The ALJ further found that although Plaintiff suffered from medically determinable depression with anxiety, he was capable of performing past relevant work based on his RFC. (R. at 18). In his capacity as a legal secretary, Plaintiff did not supervise anyone and performed sedentary work, such as typing. (R. at 17). The ALJ determined Plaintiff's RFC as follows: "able to understand, carry out and remember simple and more complex instructions; capable of responding appropriately to supervision and co-workers; and capable of dealing with change in a routine work setting." (R. at 18). The ALJ found, "despite his complaints of concentration and memory problems, mental evaluations have revealed his ability for attention and concentration as well as [an intact memory]." (R. at 17).

8

## II. Discussion

### A. Standard of Review

#### 1. Standard for Entitlement to Benefits under the Act

A claimant is entitled to DIB under the Act only if he or she satisfies all the relevant requirements of the statute.  To establish a valid claim for DIB, the claimant must meet the insured status requirements of 42 U.S.C. § 423(c).  Furthermore, the claimant must demonstrate that she was disabled within the meaning of the Act.

#### 2. Analysis for Determining Disability

Under the Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Physical or mental impairments are those that "result[] from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  Furthermore, an individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

Social Security regulations provide a five-step, sequential evaluation procedure to determine whether a claimant is disabled.  20 C.F.R. § 404.1520.  First, the Commissioner must inquire whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §

404.1520(a)(4)(i).  If the claimant is found to be currently engaged in substantial gainful activity, he will be found not disabled without consideration of his medical condition.  20 C.F.R. § 404.1520(b).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must then decide whether the claimant suffers a severe impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  If the impairment is not severe, the claimant will be found not disabled.  20 C.F.R. § 404.1520(c).  Third, If the claimant is found to be suffering from a severe impairment, the Commissioner must decide whether the impairment equals or exceeds in severity one of the impairments listed in Appendix I of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the impairment is listed or is the equivalent to a listed impairment, the Commissioner must find the claimant disabled without consideration of other facts.  20 C.F.R. § 404.1520(d).  Fourth, if the impairment is not listed, the Commissioner must consider whether the claimant has sufficient residual functional capacity to perform his past work.  20 C.F.R. § 404.1520(a)(4)(iv).  Residual functional capacity is defined as what the claimant "can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  If a claimant has the residual functional capacity to meet the physical and mental demands of his past work, the Commissioner must find him not disabled.  20 C.F.R. § 404.1520(f).  Finally, if the claimant cannot perform any past relevant work, the Commissioner must determine, on the basis of claimant's age, education, work experience, and residual functional capacity, whether he can perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).  If he cannot, the Commissioner will find him disabled.  20 C.F.R. § 404.1520(g).  The claimant bears the initial burden of proving that his impairment prevents him from returning to past relevant work.  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000).  If the claimant satisfies the first four steps, then the burden shifts to the Commissioner to prove the

existence of work that exists in significant numbers in the national economy and that the claimant could perform.  Id.

## B. Scope of Review

A reviewing court must uphold the Commissioner's factual findings if they are supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).  Substantial evidence means "more than a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Perales, 402 U.S. at 401 (quoting Consol. Edison, 305 U.S. at 229).  However, substantial evidence "does not mean a large or considerable amount of evidence . . . ."  Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence may be "less than a preponderance."  Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988). Some types of evidence will not be "substantial."  For example,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).

"The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner."  Claussen v. Chater, 950 F.Supp. 1287, 1292 (D.N.J. 1996) (citing Stewart v. Sec'y of Health, Educ. & Welfare, 714 F.2d 287, 290 (3d Cir. 1983)).  The standard affords "deference to inferences drawn

from the facts if they, in turn, are supported by substantial evidence." Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). "The inquiry is not whether the reviewing court would have made the same determination, but, rather, whether the Commissioner's conclusion was reasonable." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988)). Therefore, a court may not "set the Commissioner's decision aside if it is supported by substantial evidence, even if [the reviewing court] would have decided the factual inquiry differently." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

The reviewing court has a duty to review the evidence in its totality. Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf, 972 F. Supp. at 284 (quoting Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)) (internal citation omitted). The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581, 584-86 (3d Cir. 1986)). As the Third Circuit has held, access to the Commissioner's reasoning is essential to a meaningful court review:

> [U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Educ.

& Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (internal citation omitted)).  Nevertheless, the

court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-

finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743

F.2d 1002, 1007 (3d Cir. 1984)).

### C. Subpart P Criteria

Affective Disorders and Anxiety Related Disorders are two of the conditions that fall

within the category of mental impairments.  See Appendix 1 to Subpart P of Part 404-Listing of

Impairments ("Listing"), Mental Disorders 12.00.  Affective disorders are characterized by a

disturbance of mood, accompanied by full or partial manic or depressive syndrome.  Id.  "The

required level of severity of [an Affective Disorder] is met when the requirements in both [parts]

A and B are satisfied."  (Listing 12.04).  Part A requires "[m]edically documented persistence,

either continuous or intermittent" of depressive syndrome.  Id.  Depressive syndrome must be

characterized by at least four of the following: anhedonia/pervasive loss of interest in almost all

activities, appetite disturbance with a change in weight, sleep disturbance, psychomotor agitation

or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or

thinking, thoughts of suicide or hallucinations, delusions or paranoid thinking.  Id.  Part B

requires that the depressive syndrome result in at least two of the following: marked restriction of

activities of daily living, marked difficulties in maintaining social functioning, marked

difficulties in maintaining concentration, persistence or pace or repeated episodes of

decompensation, each of extended duration.  Id.

In Anxiety Related Disorders, "anxiety is either the predominant disturbance or it is

experienced if the individual attempts to master symptoms; for example, confronting the dreaded

13

object or situation in a phobic disorder." (Listing 12.06). When the requirements of both Parts A and B are satisfied, the required level of severity for these disorders has been established. Id. Part A requires medically documented findings of at least one of the following: a persistent irrational fear of a specific object, activity, or situation, which results in a compelling desire to avoid the dreaded object, activity, or situation. Id. Part B is the same in Affective Disorders as it is in Anxiety Related Disorders and must be found in conjunction with Part A. Id.

### III. ANALYSIS

Plaintiff raises three arguments in support of his position that the Commissioner's decision is not supported by substantial evidence: (1) the ALJ inappropriately found that Plaintiff's impairments did not meet or equal the criteria of the relevant Listing Impairment; (2) the ALJ did not give proper weight to his subjective testimony; (3) the ALJ did not properly evaluate the medical evidence in the finding that he could return to past relevant work; and (4) the hearing conducted by the ALJ was unfair and biased.

### A. Subpart P Criteria

Plaintiff argues the ALJ inappropriately found his impairment(s) did not meet or equal the criteria of either section 12.04 or 12.06 of the Listing of Impairments. ("Pl. Br. at 4). The Court disagrees.

Plaintiff claims that his symptoms were continuous and intermittent under section 12.04, in contrast to the Commissioner's finding that Plaintiff's symptoms only occurred "once or twice." Id. (quoting Defendant's Reply Brief ("D. Br.") at 6). Plaintiff suggests that in the absence of a statutory definition, the natural and ordinary meaning of a term should be applied. (Pl. Br. at 4). Plaintiff defines "intermittent" as "stopping and starting at intervals," (The

14

<u>American Heritage Dictionary of the English Language</u> (Fourth Edition 2000)), and "coming and going at intervals: not continuous" (Merriam-Webster Online Dictionary, http://www.merriamwebster.com).  However, Plaintiff's definition of the term "intermittent" serves to substantiate the Commissioner's finding.  In order for symptoms to qualify under that definition, they cannot occur only "once or twice," but rather must come and go at intervals.  An interval is a space of time between events, states, objects units or points. (<u>Id.</u>).  Plaintiff's definition of "intermittent" requires intervals in the plural sense and therefore, more than one interval is necessary to satisfy the criteria.  Where symptoms occur "once or twice," there cannot be more than one interval.  Thus, the Commissioner was justified in finding that the symptoms which occurred "once or twice" did not satisfy the continuous or intermittent requirement.

With respect to Listing 12.06A, Plaintiff alleges that the Commissioner erred in finding that "[Plaintiff] could not meet Listing 12.06 Part A due to the fact that his treatment notes did not support the occurrence of panic attacks." (Pl. Br. at 5).  This argument is without merit.  In evaluating the criteria for personality disorders under the Psychiatric Review Technique, Dr. Rahman found that "a medically determinable impairment [was] present that does not precisely satisfy the diagnostic criteria," noting that he "r/o [ruled out] panic disorder with agoraphobia." (R. at 161).  Additionally, neither of the initial evaluations at Trinitas Hospital listed panic disorder as a diagnosis.  (R. at 137, 148).  Although Plaintiff concedes that Dr. Rahman did not diagnose panic disorder with agoraphobia, he claims that the notation "r/o disorder with agoraphobia" suggests that further analysis is required in order to rule out panic disorder.  (Pl. Br. at 5).  However, regardless of the interpretation of the abbreviation "r/o," evidence of a "physical or mental impairment" must be "demonstrable by medically acceptable clinical and laboratory

15

diagnostic techniques." 42 U.S.C. § 423(d)(3). Thus, due to the absence of an affirmative medical diagnosis of panic disorder, the Commissioner did not err in determining Plaintiff did not satisfy the Listing 12.06 Part A.

Plaintiff further contends that the ALJ erred in interpreting his fear of being hurt by other people as a social issue. Rather, Plaintiff contends that his fear of being hurt is an irrational fear which satisfies the criteria of Listing 12.06 Part A. (Pl. Br. at 6). Part A requires medically documented findings of at least one of the following: a persistent irrational fear of a specific object, activity, or a situation which results in a compelling desire to avoid the dreaded object, activity or situation. (Listing 12.06 A). However, the record contradicts the position that Plaintiff's avoidant behavior amounted to an irrational fear. Plaintiff on his own decided to join and attend a computer class. (R. at 125-135). He actively sought out employment and even noted that he was "trying to find part time [work]." (R. at 27). At meetings with his therapist, Plaintiff expressed his desire to become more socially outgoing and was receptive to the idea of getting involved with a gay and lesbian organization. (R. at 135, 197). Plaintiff acknowledges going on interviews, using public transportation, and attending computer class, but argues this is the limit of his social activity. (Pl. Br. at 7). Plaintiff's active attempts to engage in social situations combined with his reluctance to trust people support the Commissioner's determination that Plaintiff suffered from social issues.

Plaintiff's argument that the Commissioner erred in finding that Plaintiff could not satisfy the criteria for Subpart B of Listing 12.04 and 12.06 also fails. (Pl. Br. at 8). Plaintiff concedes that the medical opinions regarding his mental state vary in degree, but claims that none of the opinions contradict his treating therapist or psychiatrist evaluations, demonstrating the marked

16

limitations of his condition.  (Pl. Br. at 9).  Specifically, Plaintiff argues that the medical

evidence, based on evaluations by Plaintiff's mental health professionals, demonstrates that he

"spends most of his time in bed, has trouble with simple daily tasks like shopping and cooking,

isolates himself from everyone, even when outside of his room."  Id.  Plaintiff argues that an ALJ

must lend controlling weight to a treating physician where the evidence is not contradicted.  Id.

Furthermore, Plaintiff argues that form reports in which the physician only checks boxes and fills

in blanks are weak evidence.  (Pl. Br. at 6).

State agency medical consultants' opinions shall be considered in weighing all the

evidence.  20 C.F.R. §§ 404.1527(f) and 416.927(f).  The Subpart B criteria requires a marked

restriction of at least two of the following: activities of daily living, social functioning,

concentration, and persistence or pace.  (Listing 12.04, 12.06).  Where "marked" is used as the

"standard for measuring the degree of limitation, it means more than moderate, but less than

extreme."  Listing 12.00.  Here, the evaluation of Dr. Rahman, with respect to the Part B criteria,

indicates that Plaintiff "had mild restrictions of activities of daily living; moderate difficulties in

maintaining social functioning and maintaining concentration, persistence or pace; and no

episodes of decompensation, each of extended duration."  (R. at 164).  Additionally, the intake

assessment of Plaintiff's treating therapist, Mr. Briscese, determined only mild impairment, not

moderate or serious, with respect to coping skills/psychological resources; interpersonal/social

skills; community living skills; and vocational functioning skills.  (R. at 147).  Where, as here,

neither the treating physician nor the consultative experts document Plaintiff as having a

"marked" restriction, the Commissioner did not err in his conclusion that Plaintiff does not

satisfy the criteria of Part B.

## B. Subjective Complaints

Plaintiff argues the ALJ erred by not giving the appropriate weight to his subjective symptoms. (Pl. Br. at 9). Indeed, "[a]n ALJ must give serious consideration to a [claimant's] subjective complaints of pain." Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985)). However, "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). "An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability [under the Act]." 42 U.S.C. § 423(d)(5)(A). The ALJ has the discretion "to evaluate the credibility of [Plaintiff's] testimony and to render an independent judgment in light of the medical findings and related evidence regarding the true extent of such disability." Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995) aff'd, 85 F.3d 611 (3d Cir. 1996) (citing LaCorte v. Bowen, 678 F. Supp. 80, 83 (D.N.J. 1988)).

Here, the ALJ concluded Plaintiff's allegations regarding his limitations were not totally credible. (R. at 18). The ALJ found that "the evidence [did] not establish a level of severity of depression or anxiety...compatible with sections 12.04 or 12.06." (R. at 15). The ALJ noted that "the mental evaluation with Trinitas as well as a psychiatric consultative evaluation with Dr. Klah, in June 2003, reveal[ed] that despite feelings of depression, anxiousness and a sleep disturbance, there was no evidence of psychosis." Id. The ALJ also highlighted the positive report given by Plaintiff's treating therapist contending that "motor activity was calm; mood was neutral; affect was appropriate; speech was normal; thought process was intact; and that the claimant was fully oriented." Id. Due to the absence of objective evidence supporting the subjective claims, the Court finds that the ALJ's discretionary determination of credibility

18

provided a sound basis for the Commissioner's judgment.

## C. Evidence

Plaintiff alleges the ALJ did not properly evaluate the medical evidence in making the finding that he could return to past relevant work.  (Pl. Br. at 9).  Specifically, Plaintiff claims that the Commissioner erred in relying on the non-treating, consultative evaluation of Plaintiff and in ignoring substantial evidence in the treatment notes by his therapist.  Id.

A treating source's opinion on the nature and severity of a claimant's impairment is entitled to controlling weight only "if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." 20 C.F.R. § 404.1527(d)(2).  However, where the medical evidence is conflicting, an ALJ must decide between the conflicting evidence.  Williams, 970 F.2d at 1187 (citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).  Furthermore, the plaintiff bears the burden of demonstrating through medical evidence that he is not able to return to past relevant work. Rossi, 602 F.2d at 48.

Here, in determining that Plaintiff was able to return to past relevant work, the ALJ considered evidence from both the treating and non-treating sources.  Balancing Plaintiff's impairment(s) against the nature of his previous work and the relevant evidence, the ALJ opined:.

> The evidence in this case establishes that [Plaintiff] has past relevant work as a secretary in law firms from 1990 to 2001.  He reported that the job required typing by using a Microsoft computer program; answering phones; and making arrangements.  He did not supervise anyone nor was he a lead worker (Exhibit 1E).  In another [W]ork [H]istory [R]eport [the Plaintiff] reported that he worked as a legal secretary from 1985 to 2002.

(R. at 17).  The ALJ further noted that "Dr. Klahr, who performed a psychiatric consultative examination, in June 2003, assessed that [Plaintiff] is able to follow, understand and complete both simple and more complex instructions; and that he related well to the interviewer."  (R. at 17).  The ALJ found that this evaluation revealed "Plaintiff's ability for attention and concentration as well as memory was intact."  (R. at 16).  Additionally, the ALJ considered testimony in which Plaintiff admitted to actively seeking work.  (R. at 27).  The ALJ considered the October 2002 medical assessment in which Plaintiff's treating therapist indicated that Plaintiff's coping skills, interpersonal/social skills, activities of daily living and vocational skills are only mildly impaired.  (R. at 16).  In sum, the Court finds the ALJ considered all relevant information without relying solely on the evaluation of a non-treating physician and appropriately found that Plaintiff failed to establish that he was unable to return to past relevant work.

Plaintiff's argument that the ALJ improperly found that he could return to past relevant work fails.  (Pl. Br. at 9).  Plaintiff contends that his avoidant behavior prohibits him from functioning in the work place.  Id.  "Past relevant work is work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 404.1560(b)(1).  The record establishes that Plaintiff is able to care for his personal needs, such as cooking and cleaning.  (R. at 15).  He travels by means of public transportation and has a driver's license.  Id.  Additionally, progress notes indicate that in July 2003, Plaintiff began a five month job training computer school and that over the course of time he has been actively seeking employment.  (R. at 189, 192, 196).  The ALJ noted that "despite [Plaintiff's] complaints of concentration and memory problems, mental evaluations have revealed that his ability for attention and concentration as well as memory [are]

20

in tact."  (R. at 16).  Although the progress notes indicate avoidant behavior, the ALJ properly

found Plaintiff could return to past relevant work based on medical evidence regarding Plaintiff's

mental capacity and progress notes regarding his daily activities.  (R. at 125-35, 177-200).

### D. Fair and Impartial Hearing

Finally, Plaintiff contends the hearing conducted by the ALJ was unfair and biased.  (Pl.

Br. at 11).  With respect to the administrative hearing conducted by the ALJ, "[a]lthough the

hearing is informal in nature, due process requires that any hearing afforded a claimant be full

and fair."  Ventura v. Shalala, 55 F.3d 900, 900 (3d Cir. 1995).  While "administrative hearings

are not formal trials, [neither] should they be so informal or limited that their fairness is

destroyed."  Id. at 905 (quoting Rosa v. Bowen, 677 F. Supp. 782, 783 (D.N.J. 1988)).   The right

to an unbiased judge is essential to a full and fair hearing.  Ventura, 55 F.3d 900 at 901.

Moreover, "[t]he due process requirement of an impartial decision maker is applied more strictly

in administrative proceedings because of the absence of procedural safeguards normally available

in judicial proceedings."  Id.  at 903.

An ALJ is required to conduct himself in an impartial manner and failure to do so may lead

to reversal and remand of the action.  "Notwithstanding and recognizing the time pressures

imposed upon those hearing the huge volume of such claims, rudeness, impatience, or outright

bias cannot be tolerated."  Id. at 901.  "The administrative regulation providing for

disqualification of [ALJs] contemplates that judicial review of bias claims take place in review

proceedings under 42 U.S.C. § 405(g)."  Id. at 900.  In the event that a finding of bias can be

deduced from the hearing transcript, then the decision will be vacated and the case will be

remanded for a full and fair hearing.  Id. at 904.

21

This Court has reviewed the transcript of Judge Muehlig and finds that it evidences bias on behalf of the ALJ.  When Plaintiff told the ALJ about the information he relayed to potential employers regarding his necessary absence on Mondays for therapy, the ALJ reprimanded Plaintiff for being honest with his potential employers.  (R. at 26).  The ALJ told Plaintiff that he should "know better than that."  Id.  Further the ALJ told Plaintiff, "You don't really want a job if you do that."  Id.  The ALJ then suggested that in lieu of revealing his expected repeated absences during the interview process, after obtaining the position, Plaintiff should "just mention it to the fellow on Friday night and say, I have a doctor's appointment on Monday" and "the next Monday you'll come up with another." (R. at 27).  After Plaintiff reiterated that he told potential employers about his therapy sessions because of his necessary and repeated absences from work, the ALJ responded by saying "you're not that dumb, are you?" (R. at 28).  When Plaintiff responded that he was just being honest, the ALJ said, "No you're not honest.  You really don't want the job.  Okay, that's not being honest.  That is being silly."  Id.  Moreover, the ALJ scolded Plaintiff and said "you go, but you don't do that in the interview for the job.  You know better than that."  (R. at 26).  If he was questioned as to why he attended therapy, Plaintiff told the ALJ that he would admit to potential employers that he suffers from depression.  (R. at 28).  The ALJ reacted by saying, "I'm sure that makes a hit."  Id.  "[I]n Social Security disability claim hearings the [ALJ] has an affirmative obligation to assist the claimant in developing the facts."  Ventura, 55 F.3d 900 at 904. "[E]ven if the record was totally devoid of evidence supporting a finding of disability, the bias of the adjudicator might still be ground for setting aside a determination adverse to the claimant."  Id.

The transcript of this hearing does not evidence an intent by the ALJ to fully and fairly

develop the facts in this case.  To the contrary, the record of this hearing evidences the ALJ's

unnecessary criticism of Plaintiff.  The ALJ is obligated to conduct himself in an impartial

manner and any violation of this duty will result in reversal and remand of the case.  The ALJ

failed to meet this obligation, therefore, this matter must be reversed and remanded.

## IV. <u>CONCLUSION</u>

For the aforementioned reasons, the Court finds that the ALJ's conduct at the hearing

demonstrated bias and therefore Claimant is entitled to a new hearing.  As such, the decision of

the Commissioner is reversed and remanded.  An appropriate Order accompanies this Opinion.


<u>S/   Dennis M. Cavanaugh</u>
Dennis M. Cavanaugh, U.S.D.J.


Date:          August 15, 2006
Original:      Clerk's Office
Cc:            All Counsel of Record
               File


23